406

GUILLERMINA GONZÁLEZ REYES, LUIS TORREGROSA RODRÍ-
GUEZ y JUAN COLÓN RODRÍGUEZ, ETC., demandantes y
apelantes, *v.* HON. CARLOS ROMERO BARCELÓ, como PRE-
SIDENTE DEL PARTIDO NUEVO PROGRESISTA, y el PAR-
TIDO NUEVO PROGRESISTA, demandados y apelados.

*Número:* O-83-373      *Resuelto:* 17 de junio de 1983

*Luis R. Dávila Colón,* abogado de los recurrentes; *Alex González* y *Alberto J. Pérez Hernández,* abogados del recurrido Hon. Carlos Romero Barceló; *Antonio Córdova González,* abogado del recurrido Partido Nuevo Progresista.

EL JUEZ ASOCIADO SEÑOR TORRES RIGUAL emitió la opinión del Tribunal.

En *P.P.D.* v. *Gobernador,* 111 D.P.R. 8, 15 (1981), resolvimos que al surgir una vacante en la Asamblea Legislativa la facultad de cubrir el escaño en primer término corresponde al partido del legislador que la provocó. Reconocimos entonces que el método de sustitución que adopte el partido para cubrir el escaño vacante está sujeto a las garantías del debido proceso y la igual protección de las leyes. Hoy se nos plantea si la designación del sustituto por los organismos internos de un partido —Asamblea de Delegados de Comités de Unidad Electoral— cumple o no con tales garantías.

Pasamos de inmediato a exponer brevemente los hechos que dieron lugar a este recurso y los fundamentos de nuestra decisión.

En las elecciones generales celebradas en el año 1980 resultó electo Representante a la Cámara por el Distrito Representativo Núm. 4 de San Juan el candidato del Partido Nuevo Progresista, Sr. Adolfo Dones.

En el 1981 el Partido Nuevo Progresista, luego de celebrar vistas públicas a través de toda la Isla, revisó su reglamento. El nuevo reglamento fue aprobado por el Comité Ejecutivo del partido, la Junta Central y, finalmente, la Asamblea General del partido el 15 de noviembre de ese año. Dicho partido llevó a cabo una reorganización conforme las disposiciones del nuevo reglamento. Así se establecieron los comités de Unidad Electoral como los comités base del partido. Éstos se estructuraron según los

límites geográficos establecidos por la Comisión Estatal de Elecciones para cada Unidad Electoral. Cada comité consiste en un presidente, un vicepresidente, tres mujeres, tres jóvenes y un miembro por acumulación por cada colegio electoral que haya en la Unidad Electoral. Todos estos miembros son los delegados de la Unidad y se eligen mediante voto secreto en colegio abierto entre electores *bona fide* del P.N.P. que residen en los límites geográficos de la Unidad. Estos miembros, a su vez, eligen un presidente y un vicepresidente de precinto y dos delegados del precinto ante el Comité Central Municipal. Véanse los Arts. 63 y 64 del Reglamento del Partido Nuevo Progresista del 15 de noviembre de 1981.

En el caso que aquí nos concierne, el Distrito Representativo Núm. 4, el precinto quedó constituido por 34 comités de Unidad Electoral y 412 delegados en total. El presidente electo fue el Hon. Adolfo Dones y como vicepresidente quedó el Sr. Sixto Ortiz.

El 15 de abril de 1983 falleció el representante Dones, creándose la vacante aquí en controversia. En su capacidad de presidente del partido, y conforme la facultad conferida por el Art. 86 del Reglamento, el Hon. Carlos Romero Barceló recomendó al secretario del partido que se celebrara una Asamblea de Delegados para nominar a un candidato para cubrir esta vacante. El 10 de mayo el Comité Ejecutivo del partido aprobó una resolución en la que adoptó las recomendaciones de su presidente y ordenó la celebración de la asamblea el 5 de junio. Presentaron candidatura para aspirar al cargo los señores David Robles, Iván Ortiz y Edgar Correa.

El 20 de mayo la Sra. Guillermina González Reyes y otras dos personas presentaron acción de sentencia declaratoria e *injunction* contra el Hon. Carlos Romero Barceló, como Presidente del Partido Nuevo Progresista y como Gobernador de Puerto Rico, el Partido Nuevo Progresista, la Comisión Estatal de Elecciones y el Estado Libre Asociado de Puerto

Rico.[1] Alegaron ser electores calificados, residentes del Precinto 4 y afiliados *bona fide* al P.N.P. Se enmendó la demanda para incluir como demandantes adicionales al aspirante David Robles y otros siete electores.

El tribunal de instancia declaró sin lugar la demanda al concluir que los apelantes tuvieron una representación efectiva en la elección de los delegados y que el método utilizado para la elección de éstos no quebrantaba la Constitución del Estado Libre Asociado ni la Ley Electoral o el Reglamento del P.N.P. No conformes los apelantes interpusieron el presente recurso de apelación y en auxilio de nuestra jurisdicción le ordenamos al Partido Nuevo Progresista abstenerse de celebrar la Asamblea de Delegados señalada para el 5 de junio. Concedimos término simultáneo a ambas partes para que radicaran alegatos y así lo hicieron. Aceptamos la comparecencia de un *amicus curiae*.

## I

. El planteamiento fundamental de los apelantes consiste en que se les ha privado ilegalmente del derecho a primarias, el que apoyan en disposiciones de la Ley Electoral, Arts. 2.001(8), 4.006 y 5.006 (16 L.P.R.A. secs. 3051(8), 3156 y 3206), y en el Art. 83 del Reglamento del Partido Nuevo Progresista. En la alternativa argumentan que aunque el partido tiene facultad para adoptar métodos alternos para cubrir vacantes de representantes y senadores, el método de Asamblea de Delegados de Comités de Unidad Electoral no cumple con los requisitos establecidos en el Art. 4.006-A, 16 L.P.R.A. sec. 3156a, que fue incorporado a la Ley Electoral en virtud de la Ley Núm. 3 de 10 de enero de 1983. [2]

---

[1] El tribunal de instancia desestimó la demanda en cuanto a la Comisión Estatal de Elecciones, el Estado Libre Asociado y el Hon. Carlos Romero Barceló en su capacidad de Gobernador de Puerto Rico.

[2] Dicho artículo provee:

"Artículo 4.006-A.—Métodos Alternos de Selección.—

"Los partidos políticos podrán adoptar métodos internos para la nominación de

■ El reclamo de primarias en este caso no tiene base alguna en la Constitución del Estado Libre Asociado ni en la Ley Electoral. Por el contrario, la Constitución establece

sus candidatos siempre que así lo apruebe su organismo directivo central y se cumplan con las siguientes garantías mínimas:

"(a) Que el procedimiento de nominación adoptado asegure la expresión representativa de los electores afiliados a ese partido en las jurisdicciones correspondientes. A esos efectos, se autoriza la selección de los candidatos nominados mediante el voto directo y secreto de los afiliados, la selección de éstos por un organismo reglamentario de ese partido o por un sistema de delegados basado en la población, o en número de electores, o el número de votos obtenidos por ese partido en la elección general anterior.

"(b) Que los procedimientos para el mecanismo de selección hayan sido formalmente adoptados y estén disponibles para los militantes de ese partido y se les notifique a los participantes el proceso de selección. A esos efectos los procedimientos de selección adoptados serán radicados en la Comisión Estatal de Elecciones con no menos de 15 días antes de la celebración del proceso de selección. Las reglas que han de regir el proceso incluirán los lugares, fecha y horas donde se han de celebrar los mismos.

"(c) Que todo candidato tenga acceso previo a la lista de participantes en el proceso de selección y se le garantice un foro adecuado para impugnar la misma.

"(d) Que todos los candidatos tengan derecho a representación efectiva en las etapas críticas del proceso de selección, tales como en la de elección de delegados, en la del registro de los participantes y en el proceso de votación y de escrutinio.

"(e) Que las posiciones y lugar en que ha de figurar el nombre de los nominados en las papeletas sean seleccionadas mediante sorteo en presencia de los candidatos o sus representantes.

"(f) Que garanticen el derecho a recusar a los participantes por las razones que se disponen en esta ley y las que se dispongan en el reglamento de su partido.

"(g) Que exista igual acceso y protección a los participantes en todas las etapas del proceso de selección.

"(h) Que la votación sea libre y secreta.

"(i) Que existan mecanismos internos eficaces para impugnar la violación de estas normas y agotado ese foro el derecho de recurrir en apelación a los organismos oficiales dentro de los cinco (5) días laborables siguientes a la determinación del partido.

"Las personas seleccionadas de conformidad con el procedimiento antes descrito no tendrán que cumplimentar los requisitos de radicación de peticiones de primarias para cualificar como candidato en la papeleta electoral.

"Todo aspirante en el proceso de selección interna aquí establecido que no resultare favorecido en el mismo, estará impedido de concurrir y competir como candidato en cualquier proceso de primarias para dicho cargo celebradas conforme esta ley.

"El partido podrá dar notificación a su electorado por los medios que estime pertinentes, sobre la persona que fue seleccionada en el proceso de selección interna para representarlo en la papeleta electoral."

con meridiana claridad que "[c]uando surja una vacante en el cargo de Senador o Representante por un distrito, dicha vacante se cubrirá según se disponga por ley". Constitución del Estado Libre Asociado, Art. III, Sec. 8. En el ejercicio de esta facultad la Asamblea Legislativa adoptó las normas preceptuadas en los Arts. 5.006 y 5.007 de la Ley Electoral, que, como resolvimos en *P.P.D.* v. *Gobernador*, supra, preservan "la autonomía del partido para seleccionar, por los medios provistos en sus reglas internas, el candidato que habrá de presentar para cubrir el escaño vacante". Pág. 15.

El Reglamento del Partido Nuevo Progresista tampoco sostiene el reclamo de primarias de los apelantes. No obstante, ellos pretenden apoyar su requerimiento en la disposición del Art. 83 del Reglamento, postergando indebidamente las subsiguientes disposiciones del Art. 86. Como podrá verse a continuación, el Art. 83 se refiere únicamente a la *nominación de candidatos* mediante asambleas de todos los miembros del partido de los respectivos organismos internos:

ARTÍCULO 83:— El Partido hará una selección de todos los candidatos que han de aparecer en la papeleta electoral de las elecciones venideras bajo la insignia del Partido. Disponiéndose que dicha selección se efectuará de la siguiente manera:

A. Los Candidatos Estatales, que incluyen al Gobernador, al Comisionado Residente y a los Legisladores por Acumulación, serán seleccionados en una asamblea general del Partido, según lo dispuesto por el artículo 16, inciso (d) de este Reglamento.

B. Los Candidatos a Senadores y a Representantes por Distrito y a Alcaldes con los Asambleístas escogidos por éstos, serán seleccionados en asambleas de todos los miembros con derecho al voto de los respectivos organismos del Partido incluidos dentro de la demarcación territorial que corresponde. Estas asambleas se celebrarán simultáneamente por Distrito Senatorial, a nivel Municipal. Disponiéndose, además, que los Presidentes de Precinto, Municipio o Comité Central Municipal podrán solicitar asambleas por Precinto al

Comité Ejecutivo del Partido, dependiendo de las necesidades de su Municipio. El Comité Ejecutivo también tendrá la facultad de hacer los cambios necesarios por iniciativa propia. Los seleccionados serán los candidatos endosados por el Partido; sin que esto limite el derecho de algún miembro del Partido a acogerse al procedimiento de Primarias que dispone la Ley Electoral vigente.

Todos los organismos y oficiales del Partido tienen que dar igual oportunidad a cada candidato para la promoción de su candidatura.

Se reserva, pues, el derecho a primarias al procedimiento de nominación de candidatos.

El Art. 86 del Reglamento es el que verdaderamente establece la norma a seguirse en los casos de vacantes. En efecto, dicho artículo preceptúa que:

Todas·la vacantes se cubrirán utilizando los mismos mecanismos dispuestos para su nombramiento o elección, disponiéndose que no se permitirá sustitución alguna sin mediar previa autorización escrita del Comité Ejecutivo. En ningún caso podrá hacerse sustitución o llenar vacante alguna dentro de los diez (10) días antes de cualquier Asamblea. El Comité Ejecutivo no considerará ninguna petición de sustitución sin justa causa. En el caso de sustitución de Asambleístas Municipales se exigirá el estricto cumplimiento de los mecanismos establecidos por la Ley Municipal de Puerto Rico.

*El Comité Ejecutivo, previa recomendación al efecto del Presidente del Partido, podrá disponer en contrario a lo antes dispuesto por este Artículo, siempre y cuando se entienda que se sirve con ello a los mejores intereses del Partido.* (Énfasis suplido.)

Fue en virtud de este artículo que el presidente del partido recomendó al Comité Ejecutivo, y éste determinó oportunamente, encomendar a la Asamblea de Delegados de las Unidades Electorales del Distrito Núm. 4 cubrir la vacante creada por el deceso del Representante Dones.

En consecuencia de lo antes expuesto, no tiene validez el reclamo de los apelantes de que se les ha privado ilegalmente del derecho a primarias, pues ninguna dispo-

sición constitucional, estatutaria ni de reglamento les concede tal derecho.

## II

En el segundo planteamiento los apelantes impugnan el método alterno de Asamblea de Delegados de las Unidades Electorales escogido por el Partido Nuevo Progresista porque, a juicio de ellos, no satisface los requisitos del debido proceso de ley. El planteamiento se fundamenta de nuevo en los preceptos del Art. 4.006-A de la Ley Electoral, *ante.*

■ Esa disposición legal se refiere, sin embargo, al proceso que han de seguir los partidos políticos cuando decidan utilizar cualquier método distinto de la primaria para nominar a sus candidatos a puestos electivos en elecciones generales. La Sec. 4.006-A revela una genuina preocupación del legislador por mantener un balance entre los derechos del candidato y del partido en una etapa tan fundamental del proceso político. Véase, L. H. Tribe, *American Constitutional Law*, New York, The Foundation Press, Inc., 1978, págs. 287-290. En los Estados Unidos históricamente los estados regulan esa importante función que desempeñan los partidos. J. Kester, *Constitutional Restrictions on Political Parties*, 60 Va. L. Rev. 735, 738 (1974). En Europa la intervención legislativa en este ámbito adopta también variadas formas. Véase, D. Oliver, *Reform of the Electoral System*, [1983] Public Law 108, 124-125.

■ No obstante lo razonable que pudiera ser la intervención legislativa en el proceso alterno que los partidos adopten en la solución de sustitutos para cargos legislativos vacantes, lo cierto es que la Asamblea Legislativa de Puerto Rico se ha abstenido de abordar esa zona de nuestro derecho electoral. Desde nuestra decisión en *P.P.D.* v. *Gobernador*, *ante*, no se han alterado en absoluto las disposiciones de los Arts. 5.006 y 5.007. Como sabemos, estos artículos se limitan en lo pertinente a reconocer el derecho de los partidos

a cubrir las vacantes legislativas en un proceso de selección que sencillamente no lesione los derechos de la igual protección y debido proceso que les asisten a los interesados. El silencio legislativo se debe a las recomendaciones de la Comisión Especial creada por la Asamblea Legislativa para la Revisión del Proceso Electoral de Puerto Rico. En el Informe Adicional sobre el Proceso Electoral en Puerto Rico, la Comisión expresó a la pág. 4 lo siguiente:

> *Elecciones Especiales. La Comisión para Revisar la Ley Electoral no llegó a ningún acuerdo respecto a los mecanismos de sustitución de vacantes creadas en la Legislatura y en las alcaldías, ya que consideramos que era más conveniente dejar [los] artículo[s] 5.006 y 5.007 tal como están hasta tanto baje la decisión del Tribunal Supremo de los Estados Unidos respecto al caso del Distrito Representativo #31 de Caguas.* De bajar dicha decisión antes de ser enmendada la Ley Electoral, recomendamos que estos artículos sean enmendados por la Honorable Asamblea Legislativa de acuerdo a dicha decisión. De no bajar para la fecha de aprobación de estas enmiendas sugerimos que en la próxima Asamblea Legislativa se lleven a cabo las enmiendas pertinentes, tanto para atemperarlas con la decisión del Tribunal Supremo de los Estados Unidos si es que ellos deciden que lo correcto es llevar a cabo una elección especial, como de no bajar de ese modo, clarificar los dos artículos antes mencionados para evitar problemas futuros. [3] (Énfasis suplido.)

No se nos escapa que el legislador pudiera muy bien adoptar la norma de no revestir el proceso de cubrir vacantes, de naturaleza extraordinaria, con todos los elementos del proceso ordinario de nominación de candidatos para evitar inconvenientes y gastos a los partidos políticos.

Ante este silencio deliberado del legislador, los partidos son libres de elegir sus propios procedimientos, limitados exclusivamente por las fundamentales nociones de igual protección y debido proceso. *P.P.D.* v. *Gobernador*, ante,

---

[3] Informe de la Comisión Especial para la Revisión del Proceso Electoral de Puerto Rico, 1982, pág. 60.

pág. 15. *Cf. Developments in the Law: Elections*, 88 Harv. L. Rev. 1111, 1201 (1975).

■ No nos persuaden los argumentos de los apelantes al efecto de que el Partido Nuevo Progresista haya violado en este caso esos derechos fundamentales. La exclusión de la generalidad del electorado del proceso de selección y, por tanto, la imposibilidad de los candidatos de persuadir a esos electores no es un fenómeno ajeno a estos procedimientos alternos. Por el contrario, su uso parece ser muy frecuente. [*Rivera*] *Rodríguez* v. *Popular Democratic Party*, 457 U.S. 1, esc. 4 (1982). Así, por ejemplo, en Maryland la Sec. 13 del Art. III de la Constitución dispone que el Gobernador nombrará la persona que le recomiende el Comité Central del partido político al que estaba afiliada la persona que cesó en el cargo; en Indiana la persona que va a llenar la vacante es electa por la mayoría de los miembros del comité del precinto donde ocurrió la vacante que son del mismo partido del anterior incumbente, Ind. Code Ann. Sec. 2-2.1-2-1 (Burns 1982); en Carolina del Norte el Gobernador nombra la persona que le recomienda el comité ejecutivo del partido político al que estaba afiliado el que cesó en el cargo o el comité del distrito de la Cámara de Representantes o Senado de dicho partido, N.C. Gen. Stat. Sec. 163-11 (1982); en Illinois la vacante se llena por nombramiento del Comité Senatorial o Representativo, según sea el caso, del distrito legislativo del partido al que pertenecía el incumbente anterior, Ill. Ann. Stat. ch. 46, Sec. 25-6 (Smith-Hurd Supl. 1982–1983). Los tribunales no han vacilado en sostener la validez de este tipo de procedimientos. *Kaelien* v. *Warden*, 334 F.Supp. 602, 606–608 (1971) (tres jueces).

Por otro lado, consideramos que ni el procedimiento seguido para escoger la Asamblea de Delegados en este caso, ni el hecho de que en dicho proceso pudiesen participar menores de 18 años requiere que en este caso se alcance distinto resultado.

La Asamblea de Delegados del precinto es, como hemos

visto, el cuerpo básico en la estructura política del Partido Nuevo Progresista. Es el cuerpo más cercano al electorado novoprogresista. Constituye un sistema más representativo y abarcador que lo que aparentan ser los métodos utilizados en Maryland, Indiana, Illinois y Carolina del Norte. A fin de cuentas es el escogido por el Partido Nuevo Progresista conforme lo autoriza la ley, y no hay justificación para intervenir con su selección.

Los demandantes sostienen que hubo deficiencia significativa en la manera de selección de los delegados. Pero sus apuntamientos han sido, en lo sustancial, adecuadamente rebatidos por los apelados.

El reglamento del partido dispone que el Comité de Unidad Electoral consistirá de un presidente, un vicepresidente, tres mujeres, tres jóvenes entre las edades de 14 a 25 años y tantos miembros por acumulación como colegios de votación hay en la Unidad Electoral. Art. 63 del Reglamento del P.N.P.

Discutiremos, para concluir, el señalamiento de los apelantes en cuanto a la edad de los delegados a participar en la asamblea, que sirve de base también para la opinión disidente. La disidencia se funda en que el procedimiento alterno de Asamblea de Delegados seleccionado por el P.N.P. para cubrir la vacante del Distrito Representativo Núm. 4 está viciado "de nulidad absoluta" porque en la elección de los delegados participaron jóvenes menores de 18 años de edad. Este planteamiento no fue levantado por los apelantes en el tribunal de instancia ni ante este Tribunal. El planteamiento de ellos consiste en que pueden participar menores en la Asamblea de Delegados, que es distinto a lo que discute la disidencia.

Adviértase de inmediato que la contestación a este planteamiento de los apelantes es que se funda en una especulación: la posibilidad de que hayan sido electos jóvenes menores de 18 años como delegados. ¿Por qué descansa en la especulación un argumento aparentemente importante,

cuando el apelante tenía la responsabilidad de aducir prueba específica sobre la edad de los delegados para impugnarlos?

El argumento de la disidencia es más amplio. Se funda en la participación de menores no ya en la asamblea, sino en el proceso de selección de los delegados a la asamblea que, como ya indicamos, no fue levantado por los apelantes.

Debe tenerse presente que la participación de los jóvenes en la elección de delegados de unidades electorales está limitada a la selección de los 3 miembros de la juventud y que ellos no participaron en la elección de los restantes delegados. Aparece de los autos que en el procedimiento de elección de los delegados se utilizaron dos papeletas: una blanca para elegir al presidente, vicepresidente, mujeres y delegados por acumulación, y otra papeleta de distinto color para computar las votaciones emitidas por los delegados de la juventud, con la participación de los jóvenes entre 14 y 18 años. Este procedimiento responde a la disposición del Art. 64 del Reglamento del P.N.P., que expresamente dispone que: "los jóvenes que no cumplan 18 años de edad para la fecha de la próxima Elección General, pero sí han cumplido 14 años de edad para la fecha de la Reorganización del Partido en dicha unidad, podrán participar solamente en la selección de la representación de la Juventud en el Comité de Unidad Electoral."

Aun con respecto a este número limitado de delegados de la juventud, conviene saber que no fueron exclusivamente los menores de 18 años de edad los que los escogieron, puesto que podían votar también los otros participantes.

De todos modos, los propios apelantes admiten en su alegato que "casi todos los candidatos fueron electos por *unanimidad y sin oposición alguna*". De manera que ni aun con respecto a los delegados de la juventud hay prueba de que el voto de los menores de 18 años fue decisivo.

No obstante, aun suponiendo que fuera decisivo tal hecho, difícilmente podría quebrantarse el debido procedi-

miento de ley, pues no se trata aquí de una elección de candidatos a un puesto electivo para el cual los electores tienen que satisfacer los requisitos generales de un elector, sino de un procedimiento extraordinario de selección de un sustituto que se ha reservado exclusivamente, y hasta que la Legislatura disponga otro método, a las estructuras internas de un partido.

El Reglamento del Partido Nuevo Progresista expresamente les dio participación a los jóvenes en su estructura interna con el propósito legítimo de ofrecerles la oportunidad de integrarse al proceso democrático del país y de capacitarles en el desarrollo del liderato dentro de esas estructuras. Esta es una característica distintiva de nuestro proceso político. Los otros partidos políticos del país también le dan participación a los menores en sus estructuras internas. Véanse el Reglamento del Partido Popular Democrático, Art. 70 y el Reglamento del Partido Independentista Puertorriqueño, Art. 59. No puede imputarse vicio de inconstitucionalidad a ese esquema, pues tiene un propósito racional y deseable democráticamente. El hecho de que personas no cualificadas como electores participen en la estructura interna de los partidos que afecten el proceso político no es excepcional. Por el contrario, en el fundamental proceso de nominación de candidatos a la presidencia de los Estados Unidos participan, pueden resultar electos y son electos delegados puertorriqueños y de otras jurisdicciones que no tienen capacidad de votar luego en las elecciones del presidente.

A la luz de los anteriores fundamentos *procede que se dicte sentencia en la que se confirme la aquí recurrida y, en consecuencia, que se deje sin efecto la orden emitida en auxilio de nuestra jurisdicción el pasado 3 de junio y se conceda a los apelados un término adicional de 30 días a partir de la notificación de esta sentencia para que presenten a la Comisión Estatal de Elecciones una candidatura, a fin de llenar la vacante en el Distrito Representativo Núm. 4.*

El Juez Asociado Señor Negrón García emitió opinión disidente. El Juez Asociado Señor Dávila no intervino.

—O—

Opinión disidente del Juez Asociado Señor Negrón García.

Choca contra la Constitución un sistema de selección de un legislador como método alterno a la elección, aquel diseñado e implementado para llenar una vacante legislativa tomando sustancialmente como fuente válida el voto de menores de edad y personas no inscritas.

I

El principio general de la universalidad del sufragio consagrado en la Sec. 2, Art. II de la Carta de Derechos de la Constitución del Estado Libre Asociado —piedra angular de nuestro sistema democrático— no es irrestricto ni absoluto. Admite necesariamente ciertos requisitos mínimos para el ejercicio del voto. Así, en lo pertinente, la Sec. 4 del Art. VI preceptúa que será "elector toda persona que haya cumplido dieciocho años de edad, y reúna los demás requisitos que se determine por ley".

Fundados en estos preceptos, de existencia fundamental, disentimos de la opinión del Tribunal. A poco que reflexionemos nos percatamos de que el método escogido por el apelado Partido Nuevo Progresista (P.N.P.) para cubrir y seleccionar la vacante en el Distrito Representativo Núm. 4, acaecida con el sensible fallecimiento del Sr. Adolfo Dones Rosario, a saber, Asamblea de Delegados, está viciado de nulidad absoluta. Nos explicamos.

El sistema de Asamblea de Delegados vis-a-vis el de votación *directa* es de índole *indirecta*. Mediante el mismo, un grupo de electores da y confiere a una persona (delegado) la facultad de representarlo. El informe de la Convención Constituyente lo caracterizó como de "segundo grado", el cual "no es completamente democrático, pues el pueblo está en verdad delegando en otras personas un privilegio que le

es inherente. . . ". 4 *Diario de Sesiones de la Convención Constituyente de Puerto Rico* 2620–2621 (1952). No obstante, debidamente implementado y con arreglo al debido proceso de ley es legítimo, aunque de valor secundario.

Según el Reglamento del P.N.P., vigente desde el 15 de noviembre de 1981 —que sirvió de base para la organización actual en dicha demarcación distrital— las "vacantes se cubrirán utilizando los mismos mecanismos dispuestos para su nombramiento o elección", pero el Comité Ejecutivo podrá disponer lo contrario por recomendación del presidente, "siempre y cuando se entienda que se sirve con ello a los mejores intereses del partido". Art. 86. A su vez, los candidatos a representante por distrito, "serán seleccionados en asambleas de todos los miembros con derecho al voto de los respectivos organismos del Partido incluidos dentro de la demarcación territorial que corresponde". Éstos serán los endosados por el partido sin que se limite el derecho de algún miembro de "acogerse al procedimiento de Primarias que dispone la Ley Electoral vigente". Art. 83.

En el caso de autos, la convocatoria del Comité Ejecutivo, previa recomendación del Presidente del Partido, Sr. Carlos Romero Barceló, fue para una Asamblea de los Delegados del distrito, por entender que "sirve a los mejores intereses del partido". Expresamente rechaza la celebración de unas primarias por ello distraer los recursos económicos y producir dicho mecanismo "divisiones que debilitan".

No nos corresponde evaluar la sabiduría de esa decisión. Nuestro análisis se centra en la validez jurídica del método. Por tal razón es menester examinar cómo nace esta estructura y su composición. El Art. 63 del Reglamento reza:

> Los Comités de Unidad Electoral y los de Sub Unidad Electoral en su caso serán los Comités de base del Partido y estarán estructurados de acuerdo a los límites geográficos especificados por la Comisión Estatal de Elecciones como

Unidad Electoral. El Comité Ejecutivo del Partido tendrá la facultad, con la recomendación del Instituto Electoral y el Comité Municipal concernido, [de] permitir en ciertas jurisdicciones, por motivo de efectividad electoral y política que se utilice el concepto de Comité de Unidad Electoral o Sub Unidad Electoral. Dichos Comités consistirán de:

1. Un Presidente
2. Un Vice Presidente
3. Tres (3) Mujeres
4. *Tres (3) Jóvenes entre las edades de 14 y 25 años*
5. *Tantos miembros por acumulación como colegios de votación hay en la Unidad Electoral.*

El Presidente nombrará un (1) Secretario y un Tesorero, quienes serán Oficiales de su confianza y desempeñarán las funciones que se le[s] encomiende[n]. El Presidente podrá optar por seleccionar esos oficiales de entre los miembros electos del Comité o podrá hacer su selección libremente de entre personas fuera del Comité. (Énfasis suplido.)

Por su parte, el Art. 64(a) dispone:

Los miembros de los Comités de Unidad Electoral o Sub Unidad Electoral *serán electos* mediante voto secreto, en colegio abierto entre los electores bonafide del Partido que residen en los límites geográficos de la Unidad Electoral o Sub Unidad Electoral y que *aparezcan en las listas electorales.*

*De no aparecer en dichas listas, deberá traer evidencia de que cumplirá 18 años de edad, en o antes de la próxima Elección General,* sin embargo, los jóvenes que no cumplan 18 años de edad para la fecha de la próxima Elección General, *pero sí han cumplido 14 años de edad para la fecha de la Reorganización del Partido en dicha unidad,* podrán participar solamente en la selección de la representación de la Juventud en el Comité de Unidad Electoral o Sub Unidad Electoral. (Énfasis suplido.)

Conforme a ese mandato, previa elección interna celebrada el 25 de abril de *1982,* el Precinto 4 quedó constituido, mediante ciertas consolidaciones, en 34 comités de Unidad Electoral con 412 delegados. Según indicado, éstos com-

ponen la Asamblea de Delegados llamada a elegir el substituto, entre los aspirantes David Robles, Iván Ortiz y Edgar Correa.

A tenor con el Art. 11(b) y (c) del nuevo Reglamento, el P.N.P. posee dos registros: uno para electores inscritos y otro denominado *Registro de Personas Afiliadas*, contentivo de personas que *no son electores capacitados*. El Reglamento acuña el concepto *Juventud del P.N.P.*, integrada por jóvenes de 14 a 25 años.

Es un hecho no contradicho que durante el proceso de votación interna se utilizaron dos (2) papeletas: una color *blanca* para elegir al presidente, vicepresidente, mujeres y representantes por acumulación, y otra, color *azul*, para computar los votos emitidos por los jóvenes. Mediante la papeleta *blanca* votaron no sólo los electores *inscritos* —*bona fide* del P.N.P.— sino aquellos simpatizantes que *sin* aparecer en las listas electorales cumplirían 18 años "en o antes de la próxima Elección General" en noviembre de 1984. Además, en la papeleta *azul* votaron menores desde 14 años, pero que para las próximas elecciones generales no habrían de arribar a los 18 años. Los demandados apelados admiten que este sistema fue diseñado "precisamente para salvaguardar la igual protección de las leyes y el debido proceso de ley, *y así impedir que jóvenes sin derecho al voto pudieren votar por personas respecto a las cuales no tenían derecho a votar*". Pág. 19 del Alegato. Si ello es así, ¿cómo puede sostenerse la validez de su resultado: la Asamblea de Delegados impugnada? A su vez, ¿cómo justificarse que delegados electos por menores de edad puedan ser representativos, votar y elegir a una persona que va a ocupar un escaño legislativo? Igualmente, ¿cómo puede sustentarse que delegados electos, que son menores, puedan llenar dichas vacantes?

## II

Matemáticamente y en términos de porcentaje la proyección presuntiva de delegados "jóvenes" —entre las edades de 14 a 25 años— es impresionante:

| Número Total | Número Jóvenes | Por Ciento |
|:---:|:---:|:---:|
| 412 | 102 | 24.7 |

Notamos que esta composición representa un potencial de casi una cuarta (1/4) parte de delegados jóvenes y constituye un número sustancial.

La invalidez de la Asamblea de Delegados se proyecta en esta otra dimensión: los restantes delegados electos por la papeleta blanca. Adviértase que al autorizar y permitir el Art. 64(a) del Reglamento que votaran aquellos menores que al 25 de abril de 1982 no tenían 18 años —pero que los cumplirían para la fecha de las próximas elecciones (6 de noviembre de 1984)— de facto se autorizó que votaran también menores para los *otros* delegados. De ese modo se diseminó el germen de nulidad por todo el proceso. Ni en ocasión de elegir los delegados, como tampoco al momento de la convocatoria de la asamblea el 5 de junio de 1983, eran ni podían ser electores capacitados para conferir por delegación un voto. Es axioma elemental que quien carece de determinadas condiciones y aptitud no puede delegarlas.

Un examen cuidadoso de la prueba documental en autos refleja que no se consignó información en el encasillado denominado "Número Electoral" en cuanto a 48 aspirantes "jóvenes electos". Igual sucedió con 37 personas bajo los encasillados correspondientes a *Mujeres* y *Acumulación*. Ambas cifras totalizan 85 delegados adicionales que presumiblemente no tenían ni produjeron tarjeta electoral. Esta situación es un fuerte indicio de que no eran electores debidamente inscritos al momento en que fueron electos.

Ante este cuadro fáctico no vemos cómo la opinión del Tribunal pueda concluir que el planteamiento es especulativo y que no hay prueba en el récord que sustancie la impugnación de los apelantes. Todo lo contrario. Su existencia queda inequívocamente demostrada por la Regla 4(a) del Manual de Procedimiento de la Convención de Delegados a regir en la propuesta asamblea. Dicha regla, como motivo para recusar a un delegado, aduce que *"no es un elec-*

*tor debidamente inscrito en Puerto Rico, excepto aquellos que fueron electos por la juventud o en representación de la juventud que no tienen edad para inscribirse. Éstos solo podrán ser recusados porque no tienen o no tenían a la fecha de su elección 14 años de edad o porque a esas fechas tenían o ahora tienen 26 años de edad o más".* (Énfasis suplido.)

La insuficiencia de la norma es evidente. Bajo el diseño constitucional vigente están impedidos y descalificados de actuar como delegados aquellos que al momento de su elección —25 de abril de 1982— no estaban inscritos o eran menores de 18 años. En aquel momento era que tenían que poseer plena capacidad para válida y jurídicamente recibir la encomienda representativa. Quien de por sí carece de determinadas cualidades o aptitudes, mal puede ser receptor y representante de esos atributos pertenecientes a otros. Compárese, *Tonos Florenzán* v. *Bernazard,* 111 D.P.R. 546 (1981).

En resumen, la Asamblea de Delegados, producto de los Arts. 63 y 64, está viciada desde su incepción. Esta conclusión se impone independientemente de que todos los delegados fueran elegidos por unanimidad. Ello no desvirtúa los señalamientos expuestos como tampoco el potencial de delegados jóvenes ilegalmente electos y cómo ello afecta el carácter legítimo y representativo de la asamblea. Permitir que la misma seleccione a un legislador es inconstitucional y atenta contra principios básicos en nuestro ordenamiento electoral.

### III

Lo expuesto nos convence de la juridicidad de nuestro decreto mediante el cual se paralizó la asamblea convocada para el pasado 5 de junio de 1983. Tal y como está constituida, el Partido Nuevo Progresista no puede utilizarla para cubrir la vacante. Es menester implementar un método que de raíz no adolezca de la falla constitucional apuntada. No es suficiente, por *fiat* judicial, excluir a

determinado número de delegados (*e.g.* 102 jóvenes u 85 jóvenes, y otros) como forma de subsanar la falla. Tampoco ampliar las razones para recusar a un delegado. Aparte del número sustancial que aparenta ser, subsistiría el defecto en cuanto a los otros delegados no jóvenes. Cuantitativa y cualificativamente las fallas son de tal naturaleza que ameritan la intervención judicial. [1]

En *P.P.D.* v. *Gobernador*, 111 D.P.R. 8, 16 (1981), se estableció el principio de que el método de sustitución para cubrir un escaño vacante está sujeto a "un procedimiento de debido proceso e igual protección *de los derechos de sus electores aspirantes a la nominación*". (Énfasis suplido.) La observancia del debido proceso de ley parte de la premisa cardinal de que cualquier método que se siga será ejercido con la participación directa o indirecta de electores capacitados. Lo contrario choca con el sentido común. Sería una burla a los postulados democráticos. Aunque un partido político puede incorporar a su estructura jóvenes que no tengan capacidad para votar, no puede integrarlos al proceso que culminará en la elección de una persona para un puesto público.

Tampoco puede invocarse aquí la norma de abstención judicial a base de que, careciendo del resultado final de la Asamblea de Delegados, resulta prematura —e inclusive podría ser académica— nuestra intervención. Ante la clara violación constitucional y comprobada nulidad del método, se impone un remedio inmediato que proteja el derecho de los demandantes apelantes. Posponerlo podría tener los siguientes efectos negativos: (1) les causaría grave perjuicio; (2) dejaría en un limbo jurídico temporal la validez del

---

[1] En su alegato el apelado, mediante operación matemática, sugiere que hay un delegado por cada 38.8 votantes del P.N.P. Toma como base 16,848 afiliados que votaron en los pasados comicios electorales.

Tomando como punto de partida esa proporción de 38.8, a manera ilustrativa, excluir 50 delegados significaría dejar sin representación a más de 1,600 electores. A mayor exclusión más disminuye la representación.

método; (3) afectaría la imagen pública del P.N.P.; (4) aumentaría los gastos de ese partido, lo cual constituye uno de los fundamentos que movió a su Comité Ejecutivo a escoger este método; y (5) expondría y envolvería al Poder Judicial en la delicada función de decidir con *posterioridad* a un resultado interno eleccionario, no ya a base de una evaluación puramente jurídica de la legitimidad y suficiencia del proceso —que es lo que ahora nos ocupa—, sino de adjudicar a quién certificar como candidato.

## IV

Finalmente, nuestro disenso no debe entenderse como que priva al P.N.P. del escaño representativo Núm. 4. Éste indubitadamente pertenece a esa colectividad. Por tal motivo, siguiendo el pronunciamiento de *P.P.D.* v. *Gobernador*, supra, pág. 14, coincidimos en que dicho partido debe tener la oportunidad de hacer uso de la autonomía reservada para cubrirlo. Por lo tanto, extenderíamos el término para notificar su candidato por 60 días adicionales.

Debió revocarse la sentencia del Tribunal Superior, Sala de San Juan, de fecha 1 de junio de 1983, y en su lugar emitirse decreto declaratorio e *injunction* basados en los fundamentos expuestos.